CAMPBELL *v.* SELIG.

4-8285                                                     205 S. W. 2d 848

Opinion delivered November 3, 1947.

Rehearing denied December 15, 1947.

*Linwood L. Brickhouse* and *D. K. Hawthorne,* for appellant.

*Meehan & Seagraves* and *M. F. Elms,* for appellee.

SMITH, J. The transactions between the present parties to this litigation were numerous, intricate and confusing. The People's National Bank of Stuttgart was an original defendant, but the suit against the bank was dismissed before the final submission of the case.

We state only the facts relating to the last contract between Campbell and Selig, appellant and appellee, respectively, as the rights and liabilities of the parties

arise out of them. The first, dated April 15, 1930, reads as follows:

"Whereas, O. S. Selig has on this day conveyed to P. R. McCoy an undivided one-half interest in lots twenty-five and the south half of twenty-four of block eighteen (18) of Union Addition to the City of Stuttgart; and,

"Whereas, Joe S. Campbell has on this day borrowed sixty-five hundred dollars ($6,500) from the People's National Bank, of Stuttgart, Arkansas, and executed a chattel mortgage upon rice crops and personal property for the purpose of securing the repayment of the same on or before December 15th, 1930; and,

"Whereas, upon the payment by Joe S. Campbell of three thousand dollars ($3,000) upon the indebtedness against lot twenty-five and the south half of lot twenty-four above mentioned in favor of Union Trust Company of Little Rock, the said Joe S. Campbell would have been the owner of an undivided one-half interest in the said property and the said O. S. Selig the owner of the other half interest in said city property; and,

"Whereas, The deed executed on this day by the said O. S. Selig in favor of P. R. McCoy conveying said property is made for the purpose of conveying to the said P. R. McCoy the undivided one-half interest in said city property belonging to Joe S. Campbell.

"Now, Therefore the said Joe S. Campbell agrees to deposit in the Peoples National Bank of Stuttgart the sum of three thousand dollars ($3,000) out of the sixty-five hundred dollars ($6,500) which is being borrowed by him of said bank upon the chattel mortgage above referred to and it is understood by the said Joe S. Campbell that the said three thousand dollars ($3,000) is to be retained by said bank and used by it in retirement and payment of a like amount of the indebtedness against the said city property above referred to and that upon said payment the interest of O. S. Selig and P. R. McCoy in said city property will equal, each owning and undivided one-half interest therein.

"Now if the said Joe S. Campbell shall fully repay the indebtedness due to the Peoples National Bank of Stuttgart by him on or before December 15th, or before the maturity of said indebtedness then the said P. R. McCoy agrees to re-convey the undivided one-half interest in said city property to O. S. Selig, but should the said Joe S. Campbell fail or refuse to repay said indebtedness in accordance with the chattel mortgage and note or notes evidencing said indebtedness then the said deed of conveyance to said city property in favor of P. R. McCoy shall constitute a mortgage upon said city property and any and all interest which the said Joe S. Campbell may now have or may then have in said city property shall be subject to foreclosure in like manner and form as though the said deed constituted a mortgage upon said property from the said O. S. Selig and the said Joe S. Campbell in favor of the said P. R. McCoy as trustee for the Peoples National Bank of Stuttgart, Arkansas.

"And I, Nancy Campbell, wife of the said Joe S. Campbell for and in consideration of the said sum of money, do hereby release and relinquish unto the said P. R. McCoy as trustee for the Peoples National Bank of Stuttgart, Arkansas, all my rights of dower and homestead in and to said city property.

"In witness whereof the parties hereto have subscribed their names on this 15th day of April, 1930.

"/s/ Paul R. McCoy
"/s/ O. S. Selig
"/s/ Joe S. Campbell
"/s/ Nancy Campbell."

This contract was reaffirmed in a second contract, dated June 29, 1931, much of it being identical, with these additional recitals.

"Whereas, under a previous agreement dated April 15th, 1930, the sum of three thousand dollars ($3,000) was deposited in the Peoples National Bank by Joe S. Campbell with the understanding that said amount would be paid to the Union Trust Company of Little Rock upon

an indebtedness owing by the said O. S. Selig to said Union Trust Company and secured by a first mortgage upon the property hereinafter described; and,

"Whereas, the said three thousand dollars ($3,000) or approximately all of said sum is still on deposit in said bank and shall remain there for the purposes herein expressed, and when said amount is paid to the said Union Trust Company then the said Joe S. Campbell shall become the owner of an undivided one-half (½) interest in the said above described property and the said O. S. Selig shall become the owner of the other half of said property subject to the lien of any unpaid indebtedness due the Union Trust Company and the said Joe S. Campbell's interest in said land being subject to an indebtedness in favor of the Peoples National Bank in the sum of six thousand dollars ($6,000):"

We shall refer to these contracts as the agreement.

The essential facts leading up to the execution of this agreement which must be stated to understand it are as follows. Selig and Campbell, in conjunction with a third party, whose interests they acquired, bought lots in the City of Stuttgart, on which they erected a gasoline filling station, largely with borrowed money. The title of the lots was taken in the name of Campbell, but it is undisputed that he and Selig owned the lots as tenants in common, of equal interests. On April 2, 1928, Campbell conveyed the lots to Selig, by warranty deed, for which no money consideration was paid Campbell by Selig. Their banking business was conducted with the Peoples National Bank of Stuttgart, and the officers of the bank and others refer to this account as the Filling Station Account, and we shall refer to it by the same name.

While the apparent owner of the entire title, Campbell borrowed $10,333.33 from the Bankers Trust Company of Little Rock, and gave as security therefor a deed of trust on the filling station lots. This debt was not paid and a decree was rendered foreclosing the deed of trust, pursuant to which decree the lots were sold by the commissioner appointed to make the sale to Selig for

the consideration recited in the deed of $12,500. There is some uncertainty as to how Selig paid this consideration, which testimony involves certain other obligations, a statement of which would only tend to confuse the issues in this case. But the agreement set out above makes certain the fact that Selig did not intend to acquire title in severalty as sole owner.

The agreement refers to obligations which had been incurred in buying the lots and building the station, and recites the fact that Campbell lacked $3,000 of having put as much money in the venture as had Selig, and by the terms of the contract it was agreed that Campbell should advance $3,000 to be deposited with the Peoples National Bank to equalize the interest of the parties. It was contemplated that the $3,000 to be deposited with the bank should be applied to a debt owed jointly by Campbell and Selig to the Union Trust Company of Little Rock. The $3,000 was raised by Campbell in a manner presently to be stated, but instead of paying it to the Union Trust Company, it was credited by the bank to the Filling Station Account with the knowledge and consent of Selig.

Campbell borrowed $6,500 from the bank, $3,000 of which he attempted to apply as directed, and for which payment he was allowed credit on the books of the bank as shown by an audit of the Filling Station Account.

Campbell at the time was engaged in the oil business, and in growing rice on rented land. To secure the payment of this $6,500 loan, Campbell gave a chattel mortgage to the bank on his rice crop, and certain personal property, and he further secured the note evidencing the loan in the following manner. Selig conveyed to P. R. McCoy, an officer of the bank, an undivided one-half interest in the lots. The agreement above copied recites that the deed ''is made for the purpose of conveying to the said P. R. McCoy the undivided one-half interest in said city property belonging to Joe S. Campbell.''

It will be observed that the agreement recites that upon payment to, or deposit with the bank the sum of

$3,000 "the interest of O. S. Selig and P. R. McCoy in said city property will equal, each owning an undivided half interest therein." This payment was made and Campbell and Selig became owners of equal interest in the lots, but Campbell's interest remained subject to the lien on that interest created by the agreement, which by the terms of the agreement Campbell was required to discharge.

There was no consideration advanced by McCoy for this deed to him, its admitted purpose being to give the bank a mortgage on Campbell's interest to secure the payment of the $6,500 note to the bank which had been reduced to $6,000 when the second contract was entered into.

After the execution of the agreement Campbell exercised no control whatever over the filling station, and did not receive any of the rents collected thereon, and his inactivity is the basis of the plea of laches which the court sustained in dismissing the suit, which is one for an accounting.

Campbell attempts to excuse his inactivity by saying that he was insolvent and it was agreed that the rents should be applied to the payment of any indebtedness due the bank. The execution of this agreement was categorically denied by Selig, and the bank officials. We do not find there was such an agreement, but whether there was such an agreement as to the application of the rents or not, the law would so apply any rents collected or received by the bank, if while being collected the bank was in the attitude of a mortgagee in possession.

That such was the attitude of the bank appears certain if any effect is to be given to the provision of the agreement that if Campbell failed to pay the bank its debt "then the said deed of conveyance to said city property in favor of P. R. McCoy shall constitute a mortgage upon said property," and might be foreclosed as such. The express purpose and the sole consideration for the deed from Selig to McCoy was to secure the payment of Campbell's note to the bank and it was therefore a mortgage.

The payment of the debt thus secured would have left Selig as the apparent owner of the property, but the agreement recognized Campbell's interest.

This $6,500 note was not paid, but there is an admitted credit thereon of $500, resulting from the sale of rice by Campbell, but Campbell claims that if he is given credit for the rents collected by Selig, and those deposited through the Filling Station Account, the note has been paid.

The bank kept a record of all deposits to the credit of the Filling Station Account, and of all checks against it, and caused an elaborate audit thereof to be made, which was not considered or passed upon by the court for the reason found by the court, that Campbell's action for an accounting was barred by his laches. According to this audit Campbell was indebted to the Filling Station Account in a large sum of money, possibly equal to or greater than the value of his undivided one-half interest in the property. But Campbell was offered no opportunity to except to this audit, which was not in the nature of a master's report and we pass upon only a single item which will be involved in the accounting which must be had and concerning which much testimony was offered. This is a $1,500 item arising out of the sale of rice by Campbell to McGill Milling Co. In payment for certain rice McGill Milling Company gave Campbell a thirty-day draft, as was its custom in buying rice, which Campbell deposited with the bank, and was given credit therefor. This and other drafts issued by McGill Milling Company were taken up by a check given by McGill Milling Company, on a St. Louis bank, which was returned unpaid for the lack of funds. Thereafter the bank annulled this credit and we think properly so.

The testimony is sharply conflicting as to whether this draft was cashed or received for credit on account, but we think it was received for collection in the manner stated. We are confirmed in this view by the fact that on June 29, 1931, the $6,500 note was marked paid and Campbell executed a new note for $6,000, which recited

that Campbell was then indebted to the bank in that amount, which would not have been the correct balance due if Campbell had been entitled to credit for the McGill draft of $1,500. This $6,000 note referred to in the agreement above copied was executed subsequent to the draft transaction.

The execution of this $6,000 note appears to have been the last direct transaction Campbell had with Selig and the bank. He made no direct payment on this note, and made no inquiry about it and remained quiescent until May, 1944, when he filed this suit. This fact, no doubt, caused the court to dismiss the suit for laches, but Campbell testified that he knew the rents were being credited on the debt, and he had no other way of paying it, and that he waited until he thought enough rents had been collected to pay the debt.

The bank carried the $6,000 note as a subsisting obligation in its favor until June 29, 1935, when the bank examiners advised that it could no longer be carried. Thereupon McCoy, the president of the bank, deeded the lots to the bank to ''freshen up'' the Campbell note. There was no unpaid or delinquent interest on the note when this was done. Thereafter Selig and the bank treated the property as if they were the owners of it, but continued to credit the rents to the Filling Station Account, except that the bank was paid $625 as a dividend, this in addition to the interest.

According to McCoy, the bank president, the Campbell note again got stale and again in 1941, ''We got Selig to allow us to deed it (the lots) over to him. All we wanted was the part coming to us.''

The lots were deeded back to Selig, who gave the bank a note secured by a mortgage on the lots, for $5,000, and Selig's possession of the lots and his right thereto appears not to have been questioned until this suit was filed May 28, 1944. No contention is made that Campbell was advised of these transactions between Selig and the bank, and Campbell testified that he was unaware of them until he filed this suit for an accounting.

We think the plea of laches cannot be sustained in this case, notwithstanding the long period of time during which Campbell allowed Selig and the bank to control the property. This delay, though long continued, does not sustain the plea of laches for the reason that the situation as between Campbell and Selig remained unchanged and there has been no loss of evidence which would make it inequitable to require Selig to account for the rents.

The cashier of the bank testified that all the papers and transactions concerning this property were in the files of the bank relating to the Filling Station Account, and it was from these files that an expert accountant made a statement showing the account in detail. But as we have said the court below did not consider this audit of the account, and it remains to be stated and the decree will be reversed and the cause remanded for that purpose.

The bank was a mortgagee in possession until the date of the deed from it to Selig, and Selig and Campbell were at all times tenants in common, no knowledge having been brought home to Campbell that the relationship had been repudiated or that there was a holding adverse to him.

The decree dismissing the complaint for laches will therefore be reversed and the cause will be remanded, with directions to state the account between Selig and Campbell, and if so advised the court may appoint a master for that purpose, who may make such use of the accountant's audit as may be necessary and proper.

Inasmuch as Campbell personally made no payments on the $6,000 note, the interest thereon will be computed with annual rests in accordance with its tenor. A finding will be made as to all rents collected, against which will be charged all debts against the Filling Station Account which may have been paid. A finding will be made as to all expenses incurred in maintaining the filling station, and all taxes, general and special, insurance and other charges which have been paid out of the proceeds of the rents collected. All this for the purpose

of determining whether Campbell's part of the rent has paid his one-half of the filling station debts and operating expenses, and the obligations assumed by him in the agreement and if not what payment by Campbell will be required for that purpose, and Campbell will be given 30 days in which to pay Selig any balance required to equalize their interests, after the entry of the decree to be rendered in accordance with this opinion, and if not paid within that time the agreement for a mortgage upon Campbell's interest hereinabove referred to, will be foreclosed as a mortgage by a sale of Campbell's interest in the property, and the proceeds applied to the discharge of his filling station obligations, and the balance, if any, remaining will be paid to Campbell.